UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JACK PERMISON,

        Plaintiff,

   v.

COMCAST HOLDINGS
CORPORATION, et al.,

        Defendants.

CASE NO. C12-5714 BHS

ORDER DENYING IN PART
DEFENDANT COMCAST'S
MOTION TO COMPEL
ARBITRATION AND STAY
LITIGATION AND RENOTING
MOTION

     This matter comes before the Court on Defendant Comcast Holding Corporation's ("Comcast") motion to compel arbitration and stay litigation (Dkt. 17). The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file. For the reasons stated herein, the Court grants in part and denies in part the motion.

## I.    PROCEDURAL BACKGROUND

     On August 10, 2012, Plaintiff Jack Permison ("Permison") filed a complaint against Comcast and other defendants for violations of the Telephone Consumer

1  Protection Act ("TCPA"), 47 U.S.C. § 227.  Dkt. 1.  Based on a fair reading of the

2  complaint, it appears that the allegations are based on an account that Permison closed

3  with Comcast and for which Permison did not receive a final bill, but it is not entirely

4  clear that all the calls are related to a closed account.  *Id*. at 3.

5        On October 5, 2012, Comcast filed a motion to compel arbitration and stay

6  litigation.  Dkt. 17.  Comcast's position was based entirely on an agreement that Comcast

7  contends it provided Permison with his current account in Washington.  *Id*. at 5–9.  On

8  November 5, 2012, Permison responded.  Dkt. 25.  Permison states that the complaint

9  "clearly references a Comcast account that has been terminated and thus implicitly–and

10 necessarily–relates to a Colorado account."  *Id*. at 4.  Instead of withdrawing the motion,

11 Comcast replied and improperly submitted new evidence in support of the reply.  *See*

12 Dkts. 27 & 28.  Comcast submitted the agreements that it contends Permison signed

13 when he opened the now closed Colorado accounts.  Under the principles of due process,

14 the Court allowed Permison an opportunity to respond to the new evidence and

15 arguments, requested supplemental briefing and renoted Comcast's motion.  Dkt. 29.

16       On January 8, 2013, Permison filed a supplemental response in opposition to

17 Comcast's motion.  Dkt. 30.  On January 11, 2013, Comcast filed a supplemental reply in

18 support of its motion.  Dkt. 31.

19                 **II.**     **FACTUAL BACKGROUND**

20       Permison has had three accounts with Comcast for cable television and internet

21 over the last three years.  Dkt. 25 at 2 (Permison Declaration).  The first account was in

22 Denver, Colorado ("Denver Account") and was active from December 2009 until

October 2010. *Id*. The second account was in Parker, Colorado, which was active from October 2010 until January 2012. *Id*. Although the two accounts initially had different account numbers (Dkt. 2), it is undisputed that Comcast transferred its services from the Denver to the Parker location. Dkt. 30 at 9 (citing Dkt. 28 at 6). After this transfer, the two accounts had the same account number. *Id*. (*citing* Dkt. 28 at 39-94). Permison's third account is in Gig Harbor, Washington; it has been active since February 2012. Dkt. 25-1 at 2.

Permison does not dispute that he received Comcast services in Colorado and Washington, that they were installed at his Denver and Parker residences by Comcast technicians, and that he received bills for those services and paid for at least some of those services received.

Upon installation of services, Comcast maintains that its routine business practice is for technicians to provide the subscriber with Comcast's terms and conditions, the Comcast Residential Services Agreement ("Agreement"), which is contained in their Welcome Kit. Dkt. 28 at 2 (Steven R. Stainbrook Declaration, Vice President for Field Operations for Comcast Cable Communications, LLC[1]). Comcast maintains its "techinicians are specifically instructed to direct customers to read and accept the terms of the Residential Customer Agreement when they are activating their services." *Id*. The Agreement contains the binding arbitration provision that reads in relevant part:

---

[1] Comcast Cable Communications, LLC is a wholly owned subsidiary of Comcast. Dkt. 28 at 1.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

> If you have a Dispute (as defined below) with Comcast that cannot be resolved through an informal dispute resolution with Comcast, you or Comcast may elect to arbitrate that Dispute in accordance with the terms of this Arbitration Provision rather than litigate the Dispute in court. Arbitration means you will have a fair hearing before a neutral arbitrator instead of in a court by a judge or jury. Proceeding in arbitration may result in limited discovery and may be subject to limited review by courts.

Dkt. 18 at 21. The scope of the arbitration provision is addressed in the definitions section as set forth below:

> The term "Dispute" means any dispute, claim or controversy between you and Comcast regarding any aspect of your relationship with Comcast, whether based in contract, statute, regulation, ordinance, tort (including, but not limited to, fraud, misrepresentation, fraudulent inducement, negligence, or any other intentional tort), or any other legal or equitable theory, and includes the validity, enforceability or scope of this Arbitration Provision. "Dispute" is to be given the broadest possible meaning that will be enforced. As used in this Arbitration Provision, "Comcast" means Comcast and its parents, subsidiaries and affiliated companies and each of their respective officers, directors, employees and agents.

*Id*.

Permison asserts that he does not recall receiving or seeing any such terms and conditions. In his affidavit, he states:

> I signed up for the Denver and Parker accounts over the telephone. Comcast required me to have a representative come to my residence to do the installations. In connection with those installations, I gave the representatives access to my computer. I myself do not recall doing anything on the computer in connection with the installations. I do not recall seeing or reading the Comcast Residential Customer Agreement, nor do I recall seeing or reading the Terms of Service in that agreement. I do not recall checking a box stating that I agreed to the terms of service. I do not know whether the representatives may have checked that box, but I did not authorize them to do so on my behalf.

Dkt. 25-1 at 2.

ORDER - 4

While at the Parker location, Permison does not dispute that he signed at least two documents relating to his account. On August 25, 2012, he signed a Comcast Equipment User Agreement/Receipt and Authorization ("Equipment User Agreement").  Dkt. 28 at 6.  Under the signature block, this form indicates that the signatory agrees to certain statements by signing the form.  *Id*. In relevant part it reads:

> If this work order relates to initial installation of services, I acknowledge receipt of Comcast's Welcome Kit which contains the Comcast Subscriber Agreement…. I agree to be bound by the Comcast Subscriber Agreement which constitutes the agreement between Comcast and me for service. If other non-installation work was provided, I agree to continue to be bound by the current Comcast Subscriber Agreement.

*Id.*  On October 21, 2010, Permison also signed a Comcast Work Order that has a signature block, which, in relevant part, contains nearly identical wording to that quoted above. *See id*. at 8.  While Comcast has submitted these two documents signed in connection with Permison's Parker installation, Comcast has submitted no documentation or testimony relating to Permison's Denver account, showing that he actually received or agreed to the terms and conditions established in its Agreement.

With respect to Permison's Washington account, he maintains that he signed up for Comcast services through a table at a Walmart in Puyallup, Washington and has retained all the material he received.  Dkt. 25-1 at 3. He did not want to provide the Comcast representative with his social security number, so he went to the Comcast office to pay a deposit to receive his equipment.  *Id*.  He does not believe he received a self-installation kit with that equipment because he retained all the materials he received at that time and does not have such a kit.  *Id*.  He knows that he did not use a self-

ORDER - 5

1  installation kit because he was unable to complete the normal installation online as his

2  computer had a problem with Comcast's software. Instead, he worked with a Comcast

3  representative on the phone to do a manual install.  *Id*.  Additionally, Permison states that

4  he received "paperwork" from the representative in which the Comcast representative

5  wrote "No contract" and "month to month," which he attaches as an exhibit. Dkt. 25-1 at

6  3.

7        Comcast states that its business records show that Permison elected to self-install

8  his cable television and internet services, and he received a self-installation kit, which

9  included instructions for installing his services.  Dkt. 18 at 1-2 (Declaration of Mary

10 Kane, Counsel for Comcast Cable Communications, LLC).  Comcast also states that its

11 regular business practice is to provide subscribers with the Agreement which is contained

12 within the Welcome Kit, that is included in the self-installation kit.  *Id*. at 2.  According

13 to Kane's declaration:

14       In order to complete the self-installation process, customers are directed to activate their account by visiting Comcast's website at
15 www.comcast.com/activate and to follow the instructions displayed on their computer screen.  As part of the activation process, customers are prompted
16 to read and accept Comcast's "Terms of Service" contained in the Comcast Residential Customer Agreement.  To complete the activation process,
17 customers must then click the box displayed on their computer screen stating: "Yes, I agree to the Terms of Service." Comcast's business records
18 indicate that Plaintiff clicked that box, and thereby agreed to the terms contained in the Comcast Residential Customer Agreement.

19 *Id*.

20

21

22

## III.   DISCUSSION

**A.   Motion to Strike New Evidence in Reply Brief**

Permison moves the Court to strike the new arguments and evidence Comcast submitted in its reply brief.  Dkt. 30 at 2.  While it is true that courts disfavor submission of new evidence in a reply brief, in the interests of due process, the Court has given both parties ample opportunity to provide briefing on the additional evidence in support of their respective positions.  Now, in the interests of judicial economy, the Court will rule on Comcast's motion to compel arbitration and stay litigation.

**B.   The Federal Arbitration Act**

The Federal Arbitration Act ("FAA") provides that "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The purpose of the FAA is to "reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts."  *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991).  To that end, the FAA divests courts of their discretion and requires courts to resolve any doubts in favor of compelling arbitration.  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985).  The FAA requires courts to stay proceedings when an issue before the court can be referred to arbitration.  9 U.S.C. § 3.  On review of a motion to compel arbitration, the court's role is limited to a determination of (1) whether the parties entered into a valid agreement to arbitrate, and if so, (2) whether the present claims fall within the scope of that agreement.  *Chiron Corp.*

*v. Ortho Diagnostic Sys., Inc*., 207 F.3d 1126, 1130 (9th Cir. 2000).  Notwithstanding the FAA's presumption in favor of arbitrability, a court may consider generally applicable state law contract defenses – e.g., fraud, unconscionability, and duress – in determining whether an arbitration provision is valid.  *See* 9 U.S.C. § 2; *Rent-a-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772, 2776 (2010).  The party opposing arbitration bears the burden of showing that the agreement is not enforceable.  *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000).

"[I]n assessing whether an arbitration agreement or clause is enforceable, the Court should apply ordinary state-law principles that govern the formation of contracts." *Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1072 (9th Cir. 2007) (internal citations omitted), overruled on another point in *Kilgore v. KeyBank, Nat. Ass'n*, 673 F.3d 947, 960 (9th Cir. 2012).  Procedural unconscionability relates "to impropriety during the process of forming a contract."  *Nelson v.McGoldrick*, 127 Wn.2d 124, 131 (1995).  It involves "blatant unfairness in the bargaining process and a lack of meaningful choice." *Torgerson v. One Lincoln Tower, LLC*, 166 Wn.2d 510, 518 (2009).  "Procedural unconscionability is determined in light of the totality of the circumstances, including (1) the manner in which the parties entered into the contract, (2) whether the parties had a reasonable opportunity to understand the terms, and (3) whether the terms were hidden in a maze of fine print."  *Id*., at 518-519 (internal quotations and citations omitted).  These factors should "not be applied mechanically without regard to whether in truth a meaningful choice existed." *Id.* at 519.

1         Permison argues in part that the arbitration clause is procedurally unconscionable.

2  Dkt. 30 at 10.  Specifically, he asserts that "to require consumers to perform Internet

3  research to determine the meaning of the fine print before signing off on routine Work

4  Orders unfairly capitalizes on the unequal bargaining positions of the parties." *Id*.

5  Additionally, Permison argues that a court cannot enforce an arbitration clause if the

6  defendant cannot demonstrate that a plaintiff had knowledge of or received a copy of the

7  agreement containing the clause. Dkt. 25 at 8 (*citing Mattingly v. Palmer Ridge Homes,*

8  *LLC*, 238 P.3d 505, 511 (Wash. App. Div. 2, 2010)).

9         As to the Colorado accounts, the Court finds that Comcast has not produced

10  persuasive evidence that Permison ever received and had an opportunity to review and

11  understand the terms of the Agreement.  This is crucial, given the approximately 39-page,

12  single-spaced Agreement containing numerous terms and conditions, only one of which

13  is the arbitration clause. *See* Dkt. 28.  Although Comcast has submitted Stainbrook's

14  declaration indicating in part that upon installation, its standard business practice requires

15  their installation technicians to provide subscribers with their Welcome Kit containing

16  the arbitration agreement.  Stainbrook's testimony, without more, is not enough to

17  demonstrate that Permison received the agreement and had a reasonable opportunity to

18  review the agreement so as to understand its terms, consider the arbitration provision, as

19  well as its implication, and exercise his right to opt out of that provision.  *See* Dkt. 18 at 2

20  (outlining Agreement's procedure by which a subscriber can opt out of binding

21  arbitration within 30 days of receiving the Agreement).  Had Comcast produced business

22  records or testimony relating to Permison's Denver account, showing that he *actually*

received the Agreement and assented to its terms, the Court would likely have ruled differently.

As it stands, however, the Work Order and the Equipment User Agreement from Comcast's subsequent installation at the Parker location do not demonstrate that Permison assented to the terms of the Agreement.  As Permison argues, and Comcast fails to sufficiently refute, the services rendered at the Parker location did not squarely fall under "initial installation" or "other non-installation" services such that Permison's signature on either document containing that language would indicate that he is bound by the Agreement referenced therein. *See* Dkt. 30 at 9.  Rather, in the absence of evidence that Permison had already assented to the Agreement in connection with the Denver account, the Parker account documents appear to bind Permison to terms of which he had no notice, no opportunity to review, or time to understand, rendering them procedurally unconscionable.  Based on the foregoing, the Court finds that the arbitration agreement is unenforceable.

With regard to Permison's Washington account, although Permison claims   that he has "no contract" with Comcast, Permison clearly has a contractual relationship with Comcast, as he receives Comcast services and pays for them "month to month." Dkt. 25-1 at 3.  However, in contrast to the evidence Comcast produced in connection with the Colorado accounts, Comcast offers the testimony of Mary Kane, which provides evidence that Permison did indeed receive the Agreement containing the arbitration provision.  Kane's declaration indicates not only that Comcast has a business practice of providing subscribers who receive a self-installation kit with the Agreement at issue, but

also she states that Comcast's business records show that Permison received the self-installation kit as well as assented to the terms of the Agreement contained therein by clicking "Yes, I Agree to the Terms of Service" during the activation process. Dkt. 18 at 2. Although Permison states that he does not recall "checking any box stating that he agrees" (Dkt. 25-1 at 2), and he argues that he did not have knowledge of the agreement, making it procedurally unconscionable to enforce the arbitration provision against him, the Court finds that Permison received the Agreement, had the opportunity to review it for 30 days, and could choose to opt out of the arbitration provision. However, he did not. Under these circumstances, Permison has not been deprived of a meaningful choice in determining whether to accept the terms of the Agreement. Therefore, based on the evidence before it, the Court finds that the Washington Agreement to arbitrate is enforceable.

Notwithstanding the Court's determination, it is unclear to what extent, if any, the Agreement between Comcast and Permison entered into for services in Washington impacts Permison's TCPA claims. Permison has repeatedly indicated that "some or all" calls listed in his complaint relate to his Colorado account. *See* Dkt. 25 ("some, if not all, of the violative calls related to payment due on a Colorado account"); Dkt. 25-1 ("some or all of the earlier calls in my Complaint relate to my Parker account"); Dkt. 30 ("the calls subject to his TCPA claims, in whole or in part, could not pertain to his Washington account, based on the dates on which they were made"). In other words, Permison has been imprecise about the calls for which he alleges TCPA violations relate either to his Colorado or Washington accounts.

To determine whether there is a TCPA dispute regarding Permison's Washington account, which would be resolved before an arbitrator pursuant to Permison's and Comcast's Washington Agreement[2], the Court orders Permison to clarify whether any of the TCPA violations are alleged to have arisen in connection with the Washington account. If none are alleged, then the Court will likely consider retaining jurisdiction.

## IV. ORDER

The Court hereby **DENIES in part** Comcast's motion to compel arbitration and stay litigation (Dkt. 17) as discussed above, and orders Permison, by March 1, 2012, to declare whether any of the TCPA violations are alleged to have arisen in connection with his Washington account. Comcast may respond by March 8, 2013. The Clerk is directed to renote this motion for March 8, 2013.

Dated this 15th day of February, 2013.

*[signature]*

BENJAMIN H. SETTLE
United States District Judge

---

[2] Whether Permison's TCPA claims fall within the scope of an otherwise valid agreement to arbitrate is for an arbitrator to decide. *See supra* and Dkt. 18 at 21 (defining "Dispute" as "any dispute, claim or controversy"… including "the validity, enforceability or scope of th[e] Arbitration Provision").